UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOSEPH MURRAY,                                    :

                     Plaintiff,          :          05-CV-5462 (KMK)

-against-                                         :

VISITING NURSE SERVICE OF NEW         :
YORK HOME CARE, and HOWARD FREY,

                             :

                    Defendants.
-------------------------------------------------------------x

## DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1, Defendants Visiting Nurse Service of New York Home Care ("VNS") and Howard Frey respectfully submit that the following material facts are not in dispute, for purposes of this Summary Judgment Motion.

### *Parties and Case History*

1.    The Visiting Nurse Service of New York Home Care ("VNS") is a certified home health agency that provides skilled healthcare to New Yorkers in the privacy of their own homes.

2.    On November 19, 2004, VNS advised plaintiff Joseph Murray that his position had been eliminated and his employment would be terminated as a result.

3.    Plaintiff's position was terminated effective December 24, 2004.

4.    On June 9, 2005, plaintiff brought this action against VNS and his supervisor, Howard Frey.

5.      Following his job elimination, plaintiff filed a charge with the EEOC on or about December 22, 2004.  (Murray Dep. at 135; Exhibit 3).[1]

6.      In or about March 2005, VNS received a copy of a right to sue letter from the EEOC regarding Mr. Murray's claim, in which the EEOC was "unable to conclude that the information obtained establishes violations of the statutes."  (Affidavit of Mary Cristina Ruiz ("Ruiz Aff.") ¶ 8 and Exhibit A thereto).

***Background***

7.      Plaintiff began employment at VNS in or around April 2001 as Business Supervisor at the Manhattan Office of the Acute Care Program of VNS.  (Murray Dep. at 9, 10; Frey Dep. at 23).

8.      At the time of his hire, Murray reported to Rich Stonis and was primarily responsible for the supervision of the clerical staff and Escorts/Translators for the region. (Murray Dep. at 10.)

9.      In July 2001, defendant Howard Frey, Regional Operations Controller, promoted plaintiff to Field Security Manager in the Manhattan Region of the Acute Care Program. (Murray Dep. at 12; Frey Dep. at 24-25).

10.      As Field Security Manager, plaintiff supervised the Business Supervisors in their management of the mail room, medical supply room (also known as the "package" or "bag" room) and the office supply room, as well as supervising the Escorts/Translators. (Murray Dep. at 15).

11.      The mail and package rooms function interactively because some of the medical supplies needed in the package room are stored in the mail room.  Additionally, because the mail

---

[1]      Referenced deposition testimony and exhibits are annexed to the Affirmation of Tonianne Florentino.

room staff often delivers mail throughout the building, the medical supply room staff provides assistance by signing for delivered packages if no mail room staff is available. (Affidavit of Howard Frey ("Frey Aff.") ¶ 3).

12.   Plaintiff also assisted his former supervisor, Rich Stonis, who had been promoted to Director of Safety, in evaluating neighborhoods and buildings to determine safety and security conditions, investigating allegations of criminal activity and/or misconduct, and administering the Security/Access Control System. (Murray Dep. at 14-15).

13.   The harassment of which plaintiff now complains did not affect plaintiff's work performance in any manner. (Murray Dep. at 99-100).

14.   Mr. Frey was plaintiff's supervisor for almost plaintiff's entire time at VNS, and plaintiff was not subjected to any discrimination prior to early 2003. (Murray Dep. at 11-12).

**Plaintiff's Complaints to VNS Personnel**

*Comments Made By Co-Workers*

15.   In early 2003 plaintiff contends that he complained to his supervisor, Mr. Frey, about certain comments made by a few of his co-workers. (Murray Dep. at 32). Specifically, plaintiff contends that he overheard two or three male employees referring to each other as "girls," "ladies" and occasionally "bitch." (Murray Dep. 35, 40).

16.   On occasion, while he was with other men, these co-workers would greet the group by saying "good morning, ladies." (Murray Dep. at 36-37). These greetings were made among homosexual males and sometimes toward heterosexual males. (Murray Dep. at 36-40).

17.   These comments, which were intended as a greeting "like somebody would say hello"), were not intended for or directed at him specifically (Murray Dep. at 35-37, 40), and none of the comments were directed at plaintiff while he was alone. (Murray Dep. at 95).

18.    Plaintiff understood that these greetings were nothing more than employees joking around with each other.  (Murray Dep. at 35-38).

19.    Plaintiff contends that co-worker Michael Soccio made the majority of the "hello, ladies" comments, but "he did not flood you with it."  (Murray Dep. at 37).

20.    Plaintiff contends that after he reported these comments to Mr. Frey in early 2003, they subsided.  (Murray Dep. at 32-33).

21.    Plaintiff contends that these references to males as females later reoccurred, occurring intermittently and generally in passing.  (Murray Dep. at 40).

22.    Plaintiff chose not to report the additional comments to Mr. Frey or to Human Resources, even though his earlier report had resulted in a remedy of the behavior about which he complained and he knew Cristina Ruiz in the Human Resources Department because she had investigated complaints about Murray.  (Murray Dep. at 33, 55-57).

23.    Plaintiff also contends that a few male employees made isolated references to a gay pride parade and that his co-worker Lois Gioe purportedly told Murray on occasion, "don't go near Howard today, he's a real bitch" and "he must be on the rag" (Murray Dep. at 94).

*Newspaper Drawing Incident*

24.    Plaintiff also complained to Mr. Frey in early March 2004 about an incident which occurred in late February 2004.  According to plaintiff, he was walking towards his work area when he observed a group of employees gathered around a newspaper with a picture of President Bush along with the headline "President Bans Gay Marriage." (Murray Dep. at 62; Exhibit 2). Plaintiff found employee Ed Franco holding the newspaper with what plaintiff perceived to be a pencil drawing of a penis beneath the President's mouth.  (Murray Dep. at 62, 66 & Exhibit 2). When plaintiff asked who drew the picture, Mr. Franco blamed orientation nurse Michael Soccio

and plaintiff then assumed Mr. Soccio's guilt without asking Mr. Soccio if he had drawn the picture. (Murray Dep. at 84).

25.   Plaintiff's immediate response to the picture was to show it to Lin Gecaj, his subordinate and personal friend (Murray Dep. at 63, 68; Gecaj Dep. at 15), and to copy the picture (Murray Dep. at 68) and store the copy in his home safe. (Murray Dep. at 79).

26.   The following week, in March 2004, plaintiff brought the picture to Mr. Frey's attention. (Murray Dep. at 63; Complaint ¶¶ 11, 14). Frey, who knew that plaintiff did not get along with Mr. Soccio, placed the picture in his desk drawer and later threw it away. (Frey Dep. at 7-8).

27.   Plaintiff did not bring the picture to the attention of Human Resources, even after he became aware that Mr. Frey had not done so and even though plaintiff was well aware that complaints about discrimination should be brought to the attention of Human Resources and he had numerous discussions with Ms. Ruiz, Employee Relations Manager, about complaints (discrimination and otherwise) that were made about him. (Murray Dep. at 56-57, 90; Ruiz Aff. ¶ 4).

### *Unreported Offensive Conduct*

28.   Although plaintiff alleges a few isolated incidents of other behavior he found offensive, he did not make any other complaints to anyone at VNS other than the two complaints plaintiff made to Frey in early 2003 and in March 2004 (described above). (Murray Dep. at 33, 34, 55).

29.   Specifically, plaintiff contends that Frey "adjust[ed] himself" on two or three occasions in 2003, but this was not because plaintiff is male or heterosexual. (Murray Dep. at 91-93).

30.    Plaintiff contends that co-worker Louis Gioe once told plaintiff "to bend over and pick that up and I'll drive you home," but plaintiff considered Gioe's behavior nothing more than a bad joke. (Murray Dep. at 97). Plaintiff was friendly with Gioe: they shared smoking breaks and joked, and plaintiff gave Gioe a gift. (Murray Dep at 126-27, 138, 140).

31.    Plaintiff did not report these other behaviors to anyone at VNS. (Murray Dep. at 34).

### *Plaintiff's Difficulties Supervising Staff Reporting to Him*

32.    During 2003, employees in the mail and package rooms complained to VNS managers, including Virginia Field, the Regional Administrator of the Manhattan Acute Care Program, and Cristina Ruiz, Employee Relations Manager, that they were experiencing conflicts with plaintiff. (Murray Dep. at 29; Affidavit of Virginia Field ("Field Aff.") ¶ 2; Ruiz Aff. ¶ 4).

33.    Many of these complaints originated from the Senior Mail Clerk, Jose Vargas, who accused plaintiff of treating him disrespectfully and picking on him. (Murray Dep. at 29; Field Aff. ¶ 2).

34.    Plaintiff found that he and Mr. Vargas had irreconcilable differences. (Murray Dep. at 23, 26-31). Plaintiff did not know the sexual orientation of Mr. Vargas. (Murray Dep. at 31).

35.    Employees complained that plaintiff showed favoritism towards certain female employees, and improperly met with female escorts/translators behind closed doors. (Murray Dep. at 58; Field Aff. ¶ 3; Ruiz Aff. ¶ 4).

36.    In November 2003, the mailroom staff complained when plaintiff removed stairway and other security card access from all mailroom employees, interfering with the mailroom employees' ability to deliver the mail throughout the facility. (Murray Dep. at 28-29; Field Aff. ¶ 2; Ruiz Aff. ¶ 5).

37.    Ms. Field, who was Mr. Frey's supervisor, was angry about the security card incident and ordered plaintiff to restore the necessary security access to the mailroom personnel. (Murray Dep. at 29-30; Field Aff. ¶¶ 2,4).

38.    The Human Resources Department commenced an investigation into the complaints about plaintiff and his supervision of his staff.  (Murray Dep. at 29-30; Ruiz Aff. ¶ 4).

39.    As a result of the complaints to Ms. Field and the investigation conducted by Human Resources, Ms. Field and Ms. Ruiz determined in late 2003 that plaintiff's responsibilities for the supervision of the mail and package rooms should be reassigned to Susan Collymore, a Business Manager (Murray Dep. at 46; Field Aff. ¶ 4; Ruiz Aff. ¶ 6).

40.    Ms. Ruiz recommended that plaintiff receive conflict management training.  (Field Aff. ¶ 4; Ruiz Aff. ¶ 6).

41.    In furtherance of their decision to remove job responsibilities from plaintiff, Ms. Field and Ms. Ruiz also instructed Frey in early 2004 that plaintiff's Performance Evaluation and bonus for the 2003 calendar year should reflect the changes in his performance and responsibilities.  (Ruiz Aff. ¶ 6, Field Aff. ¶ 4).

42.    In the section of plaintiff's performance evaluation for the 2003 calendar year that related to Job Responsibility #3, "Management of the Stockroom, Medical Record room, Mailroom and Medical Supply Room Inventories/Business Reply Account." Mr. Frey rated plaintiff as "Does Not Meet" the expectations of this responsibility.  (Exhibit 1).

43.    Plaintiff was awarded a 4% performance bonus for 2003 in the midrange of the bonus scale. (Murray Dep. at 110; Exhibit 1).  Murray was eligible for a bonus between .10% and 7.9%.  (Ruiz Aff. ¶ 6).

44.   Plaintiff's performance evaluation was prepared and his bonus was awarded before plaintiff brought the Bush news drawing to Mr. Frey's attention, although the evaluation was not executed and the bonus was not paid to plaintiff until several weeks later.  (Frey Aff. ¶ 2).

45.   Plaintiff's immediate supervisor, defendant Frey, advised plaintiff of these decisions regarding his supervisory duties and his bonus.  (Murray Dep. at 26, 46).

46.   Plaintiff believes that the removal of the mail and package rooms from his responsibility was related to the fact that union delegates worked in those areas.  (Murray Dep. at 111).

47.   Plaintiff believes that his job responsibilities were removed because of his complaints to Frey, not because of his sexual orientation.  (Murray Dep at 31).

48.   Neither Field nor Ruiz knew of any complaints that plaintiff had made to anyone at VNS prior to reviewing his EEOC Charge in early 2005.  (Field Aff. ¶ 8; Ruiz Aff. ¶ 7).

***Plaintiff's Job Elimination***

49.   Outside of the Manhattan Region of VNS, no other borough had the position of Manager of Field Security.  (Murray Dep. at 61).

50.   Plaintiff's job functions were reduced in 2004 after Rich Stonis hired a staff member in the Employee Safety Department, who took on many of the investigation functions that plaintiff had previously performed.  (Murray Dep. at 50).

51.   As part of an ongoing effort to keep costs down, in November 2004, during a meeting to prepare the budget for the next fiscal year, Ingrid Jimenez, Vice President for Operations, Ms. Field and other VNS managers considered ways to reduce the budget.  Since none of the other regions of the Acute Care Program had Field Security Managers and plaintiff's responsibilities had diminished, Ms. Jimenez and Ms. Field determined that plaintiff's position

8

could be eliminated.  (Murray Dep. at 61, 115-17; Field Aff. ¶ 6; Affidavit of Ingrid Jimenez ("Jimenez Aff.") ¶ 3).

52.   Neither Field nor Jimenez knew of any complaints that plaintiff had made to anyone at VNS prior to their decision to eliminate his position.  (Field Aff. ¶ 8; Jimenez Aff. ¶ 4).

53.   Ms. Field informed plaintiff of his job elimination on November 19, 2004, and his termination was effective on December 24, 2004.  (Field Aff. ¶ 7).

54.   Plaintiff has not been replaced.  (Murray Dep. at 121).

***Plaintiff's Comparison of His Situation With Other Employees***

55.   Frey did not supervise Soccio and was not in a position to investigate him.  (Frey Aff. ¶ 4).

56.   Plaintiff believed that Frey did not investigate Soccio because Frey and Soccio were friends.  (Murray Dep. at 42).

57.   Plaintiff's job responsibilities were not affected when one of his subordinates accused him of racial discrimination.  (Murray Dep. at 127).

58.    Charges of harassment of others by Gioe were not ignored by VNS.  The two

employees who alleged harassment were reassigned from his supervision, and Gioe was required

to attend anti-harassment training at Cornell University.  (Gioe Dep. at 10).  Gioe also was told

that his employment with VNS would terminate if he engaged in unlawful harassment.  (Gioe

Dep. at 12).

Dated: New York, New York
       July 24, 2006

                        Respectfully submitted,

                        COLLAZO CARLING & MISH LLP

                        By: _____
                        Tonianne Florentino (TF 9811)
                        Attorneys for Defendants Visiting Nurse Service of
                        New York Home Care and Howard Frey
                        747 Third Avenue
                        New York, NY 10017-2803
                        (212) 758-7782